# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GEORGE LEE MARTINEZ, JR.,**

      **Plaintiff,**

**v.**                                      **Civ. No. 16-1273  KK**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16-1)[2] filed March 16, 2017, in connection with Plaintiff's *Motion to Reverse and Remand for Payment of Benefits or in the Alternative, for Rehearing, With Supporting Memorandum* filed June 15, 2017. (Doc. 21.)  Defendant filed a Response on August 15, 2017.  (Doc. 23.)  And Plaintiff filed a Reply on August 29, 2017.  (Doc. 24.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is well taken and shall be **GRANTED** insofar as it seeks remand for rehearing.

## I.  Background and Procedural Record

Plaintiff George Lee Martinez, Jr. alleges that he became disabled on January 24, 2013, at the age of forty-three because of degenerative disc disease of the lumbar spine, seizure disorder,

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 9.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 16-1), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

depression, anxiety, a cognitive disorder and post-traumatic stress disorder (PTSD). (Tr. 12, 58.) Mr. Martinez completed one year of college (Tr. 40) and worked for sixteen years, from 1993-2009, as a delivery driver for UPS. (Tr. 217.) His most recent job, as a part time delivery driver for a lumber company, ended in January or February 2013 because he had a seizure at work. (Tr. 32-33, 172.) Mr. Martinez has acquired sufficient quarters of coverage to remain insured through June 30, 2018. (Tr. 10.)

On February 27, 2013, Mr. Martinez protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Section 401 *et seq.* (the Act). (Tr. 10, 138.) Mr. Martinez's application was denied at the initial level (Tr. 58-64), and at reconsideration (Tr. 66-78). Upon Plaintiff's request, Administrative Law Judge (ALJ) Barry O'Melinn held a video hearing on May 13, 2015. (Tr. 10.) Mr. Martinez appeared at the hearing with attorney representative Michelle Baca. (Tr. 10.) The ALJ took testimony from Mr. Martinez (Tr. 31-47), and from impartial vocational expert (VE), Mary Diane Weber (Tr. 47-53.) On August 18, 2015, ALJ O'Melinn issued a written decision concluding that Mr. Martinez was not "disabled" pursuant to the Act. (Tr. 20.) On October 12, 2016, the Appeals Council denied Mr. Martinez's request for review, rendering ALJ O'Mellin's August 18, 2015, decision the final decision of Defendant the Commissioner of the Social Security Administration. (Tr. 1-3.) Mr. Martinez timely filed a complaint on November 21, 2016, seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

> (5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age,

---

[3] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b).

> education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.    <u>Standard of Review</u>

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision

must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

## III. Analysis

The ALJ made his decision that Mr. Martinez was not disabled at step five of the sequential evaluation. (Tr. 18-19.) The ALJ determined that Mr. Martinez met the insured status requirements of the Social Security Act through June 30, 2018 (Tr. 12), and that he had not engaged in substantial gainful activity since January 24, 2013, the alleged onset date. (Id.) He found that Mr. Martinez had severe impairments of degenerative disk disease of the lumbar spine, seizure disorder, depression, anxiety, a cognitive disorder and post-traumatic stress disorder (PTSD). (Id.) The ALJ determined, however, that Mr. Martinez's impairments did not meet or equal in severity one the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1. (Id.) Accordingly, the ALJ proceeded to step four and found that Mr. Martinez had the residual functional capacity to perform less than a full range of light work as defined in 20 C.F.R. Section 404.1567(b). The ALJ found that Mr. Martinez

> can lift and carry 20 pounds occasionally, 10 pounds frequently, stand or walk for up to six hours, and sit for up to six hours of an eight-hour workday with normal breaks. He can operate hand and foot controls within a light duty capacity. He can frequently stoop and occasionally climb ramps or stairs. However, he can never climb ladders, ropes or scaffolds. He must avoid concentrated exposure to operational control of moving machinery, unprotected heights, and hazardous machinery. He can understand, carry out, and remember simple instructions and make commensurate work-related decisions, respond appropriately to supervision in work situations, deal with routine work changes in a work setting, maintain concentration, persistence, and pace for up to, and including, two hours at a time with normal breaks throughout a normal workday. Additionally, he should work primarily with things rather than people.

(Tr. 14.)  The ALJ further concluded at step four that Mr. Martinez was unable to perform any past relevant work.  (Tr. 18-19.)  At step five, the ALJ determined based on his age, education, work experience, RFC, and the testimony of the VE, that there were jobs existing in significant numbers in the national economy that Mr. Martinez could perform.  (Tr. 18.)  Based on the VE's testimony, the ALJ identified three jobs that Mr. Martinez could perform: mail clerk/sorter (DOT 209.687-026), routing clerk (DOT 222.687-022), and shipping and receiving (DOT 222.387-074).  (Tr. 19.)

In support of his Motion, Mr. Martinez argues that the ALJ's RFC determination is contrary to the substantial evidence in the record and contrary to the governing law because: (1) it did not accord with the opinions of the treating psychologist (Doc. 21 at 13-15); (2) it was premised, in part, on an inaccurate representation of a state consultative examiner who performed a neuropsychological evaluation of Mr. Martinez (Doc. 21 at 16-17); (3) as it pertained to Mr. Martinez's ability to walk, sit, and stand, it was not supported by medical evidence (Doc. 21 at 18-19); and (4) it was based on a flawed analysis of Mr. Martinez's credibility (Doc. 21 at 19-22).  Additionally, Mr. Martinez argues that the ALJ erred in relying on the VE's testimony because (1) the VE's testimony was premised on the ALJ's flawed RFC determination (Doc. 21 at 22-23); and (2) the ALJ failed to resolve inconsistencies between Mr. Martinez's RFC (as determined by the ALJ) and the functioning required to perform the relevant jobs (Doc. 21 at 23-24).

The Commissioner argues that the ALJ's RFC determination is supported by substantial evidence and that it "reasonably accounted for all of Mr. Martinez's credible limitations."  (Doc. 23 at 4.)  As to the arguable conflicts between Mr. Martinez's functioning and the jobs identified by the VE, the Commissioner argues that even assuming that Mr. Martinez is incapable of

performing the mail/clerk sorter job or the shipping and receiving job, because he is capable of performing the routing clerk job, the ALJ's step five conclusion is supported by substantial evidence. (Doc. 23 at 12.)

As discussed more fully below, the Court concludes that the ALJ's evaluation of Mr. Martinez's mental RFC was premised, in part, on an inadequate legal and factual analysis of the treating psychologist's opinion. This error was not harmless, and the Court remands this matter for further proceedings. Accordingly, Mr. Martinez's additional arguments are not addressed.

### A.    Relevant Psychological History From 2012 Through 2014

The record contains documented evidence of Mr. Martinez's mental health difficulties dating back to June 29, 2012, on which date he was treated at the emergency room (ER) for the third time in a single week, for an "altered mental status." (Tr. 281-82, 290, 320.) The ER admission notes from this visit indicate that Mr. Martinez's chief complaint was worsening confusion over the past two days and visual hallucinations. (Tr. 290.) Further, his "mental status" was in question because he believed, while he was in the ER, that he was at a golf course. (Tr. 295.) The treatment notes indicate that he was confused, hallucinating, dazed, experiencing rapid thoughts and rapid speech, insomnia, energy and irritability disturbances, and that he had a history of chronic back pain and of prescription drug overdose. (Tr. 284.) His "assessment and plan" noted increased antidepressants. (Tr. 292.)

On July 6, 2012, Mr. Martinez was taken to the ER again after his girlfriend found him unresponsive. (Tr. 376.) He was treated for an acute overdose of benzodiazepines and opioids, and the treating physician noted that Mr. Martinez had an "altered mental status" and a history of

multiple drug overdoses which resulted in a liver injury that could eventually require a liver transplantation. (Tr. 376, 378-79.)

On October 16, 2012, Mr. Martinez saw Dr. Elizabeth Lakind, Ph.D, M.D., a specialist in neurology. (Tr. 451.) He returned to Dr. Lakind on April 10, 2013, May 6, 2013, and May 14, 2013. (Tr. 451-55.) Dr. Lakind performed evaluations related to Mr. Martinez's seizures, headaches, cognitive decline, and memory loss, and depression. (Tr. 451-54.) Dr. Lakind's treatment notes reflect "concern for difficulty in memory, information processing speed, and verbal function as well as concern for depression and anxiety." (Tr. 454.) Additionally, Dr. Lakind found Mr. Martinez's cognitive testing "notable for performance more than one standard deviation below average in memory, information processing speed, and verbal function[.]" (Id.) During their final visit, on May 14, 2013, Dr. Lakind prescribed medication to treat Mr. Martinez's depression; however, follow-up notes indicate that in June, 2013, Mr. Martinez called to report that the medication caused adverse side effects. (Tr. 455.) While Dr. Lakind's notes reflect that she anticipated "repeat cognitive testing" in November 2013, the record does not contain evidence of Mr. Martinez's continued treatment with Dr. Lakind.

Dr. Michael Baten, M.D. (a specialist in neurology) saw Mr. Martinez in January, February and August of 2014. (Tr. 504, 509 755.) In January 2014, Dr. Baten noted that Mr. Martinez was seeking treatment for seizures and memory problems, and that he admitted to being "very depressed" and "anxious for psychiatric follow up." (Tr. 509.) In February 2014, Mr. Martinez returned for a follow up regarding these same issues, and Dr. Baten recommended psychiatric consultation (noting that he had previously recommended this, but Mr. Martinez had not taken any action), and neurologic testing by Dr. Thomas Granados, Psy.D. (Tr. 504, 775.)

Dr. Granados evaluated Mr. Martinez over the course of two days—on April 16 and June 3, 2014. (Tr. 774.) The results of his neuropsychological evaluation of Mr. Martinez were "suggestive of cognitive inefficiencies" that were "likely due to . . . chronic and significant pain, generalized psychological distress, and effects of current narcotic pain medication." (Tr. 780-81.) Dr. Baten reviewed Dr. Granados's neuropsychological evaluation and noted that it revealed "spotty abnormalities" including problems with cognitive efficiency suggestively "due to chronic pain and psychological distress and possibl[y] medication related." (Tr. 755.) Dr. Baten's "impression" was that Mr. Martinez had epilepsy, cognitive insufficiency, and depression. (Tr. 755.)

On March 10, 2014, Mr. Martinez was admitted to the UNM hospital for "prolonged video EEG monitoring for clarification of possible seizure-like events." (Tr. 512.) Notes relating to Mr. Martinez's "history of present illness" include, among other things, that "sometime in 2011 he had an event where he was working with UPS delivering packages and . . . had [a] sudden onset of anxiety and fear followed by a perception of flashing lights behind him which proceeded to loss of consciousness." (Tr. 512.) He does not remember what occurred thereafter, but he was treated at the emergency room for a "convulsive episode." (Id.) It was also noted that Mr. Martinez's history included an accidental overdose of prescribed opiate medications and benzodiazepines (in July 2012), for which he was hospitalized for several weeks (including six days of life support). (Id.) Since then, Mr. Martinez reported that he had trouble with memory, six episodes of loss of consciousness, 3-4 episodes per month of a sudden onset of severe panic and anxiety lasting for 30-60 minutes, and daily episodes of mild anxiety. (Id.) The EEG monitoring did not capture any of Mr. Martinez's "typical episodes" and he was discharged with

recommendations to avoid driving and to observe other standard seizure precautions.  (Tr. 529-30.)

Dr. Lyle Amer, M.D., who had seen Mr. Martinez in September, 2012 and January, 2013, for various issues—including chronic back pain anxiety, and an injury, saw Mr. Martinez in February, April, May, and June of 2014.  (Tr. 429-30, 545-47.)  Although Dr. Amer was treating Mr. Martinez for other medical issues, his 2014 treatment notes indicate, among other things, that Mr. Martinez had severe anxiety and severe depression for which he was seeing a psychologist.  (Tr. 545, 547.)

In March, April, and May of 2014, Mr. Martinez saw Dr. George Greer, M.D.  (Tr. 536-37.)  Dr. Greer's treatment notes indicate, among other things, that Mr. Martinez's medication was making him "more mellow and a little less depressed"; but that he still had anxiety which leads to depression, causing him to feel fearful and tense with an increased pulse, hyperventilation, and sweating.  (Tr. 536.)  Dr. Greer also noted that Mr. Martinez could not remember the previous days' or months' events.  (Tr. 536.)  Dr. Greer referred Mr. Martinez to Dr. Robert Weisz.  (Tr. 772.)

**B.**     **Treating Psychologist Robert Weisz, Ph.D From March 2014 through April 2015**

Mr. Martinez began treatment with psychologist Dr. Robert Weisz, Ph.D. on March 27, 2014.  (Tr. 772.)  During their first visit, Dr. Weisz noted that Mr. Martinez was being treated for chronic lower back pain, that he had "significant memory loss" as a result of a drug overdose in July 2012, that he had severe depression, a high level of anxiety attacks, a history of seizures, that he was working with his doctors to wean off of pain medication, and that he "tries to fight off scary thoughts."  (Tr. 772-73.)  From March 2014 through April 2015, Mr. Martinez saw Dr. Weisz twenty-two times.  (Tr. 757-73, 813-16, 827.)  Dr. Weisz's treatment notes from these

visits indicate that Mr. Martinez reported having frequent panic attacks, severe anxiety (and sometimes had anxiety attacks 7-8 times per day), worsening memory problems, depression, thoughts of suicide, chronic back pain, and seizures. (757-58, 760, 766-69, 771-72, 813-14, 816.) Further, Mr. Martinez disclosed to Dr. Weisz that as a child he had been sexually abused by a school janitor multiple times over a 2-3 year period, but he had kept the abuse a secret from his family for over 35 years. (Tr. 761-63.) As an adult, Mr. Martinez had "held [the secret of the abuse] in as long as he could" but he was struggling with memories and flashbacks of it, was terrified about being victimized again, and had intense nightmares stemming from the abuse. (Tr. 758, 760, 762, 769, 815-16.) Mr. Martinez finally told his mother about the abuse on July 15, 2014, a "breakthrough" documented by Dr. Weisz's treatment notes on July 16, 2014. (Tr. 763, 771.) Eventually, Dr. Weisz referred Mr. Martinez to the Solace Crisis Treatment center for long-term treatment of his PTSD stemming from the childhood sexual abuse and complications from drug addiction over his adult years. (Tr. 813.)

On April 22, 2015, Dr. Weisz completed a "mental residual functional capacity questionnaire" pertaining to Mr. Martinez's capability to function in four categories "despite his . . . limitations." (Tr. 827.) The categories were (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 831-35) *See* POMS DI 24510.063 (defining the ratings provided on the mental RFC form, in relevant part, as follows: "not significantly limited" meaning that "the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity"; "moderately limited" meaning that "the evidence supports the conclusion that the individuals' capacity to perform the activity is impaired"; "markedly limited" meaning that "the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity"; and "insufficient

evidence" meaning "either a problem in this aspect of work function has been alleged, the evidence suggests a problem, or the [doctor's] clinical judgment suggests the likelihood of a problem").

In the area of understanding and memory, Dr. Weisz opined that Mr. Martinez was not significantly limited in his ability to understand and remember very short and simple instructions; that he was moderately limited in his ability to remember locations and work like procedures; and moderately limited in his ability to understand and remember detailed instructions. (Tr. 831.)

In the area of sustained concentration and persistence, Dr. Weisz opined that Mr. Martinez was not significantly limited in the ability to carry out very short and simple instructions; that he was moderately limited in his ability to carry out detailed instructions; markedly limited in his ability to maintain attention and concentration for extended periods; markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and markedly limited in his ability to sustain an ordinary routine without special supervision. (Tr. 832.) He also opined that Mr. Martinez was not significantly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 833.) Dr. Weisz found "no ratable evidence" of Mr. Martinez's limitations in accepting instructions and responding appropriately to criticism from supervisors or getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.)

In the area of adaptation, Dr. Weisz opined that Mr. Martinez was moderately limited in his ability to respond appropriately to changes in the work setting; markedly limited in his ability to work in coordination with or proximity to others without being distracted by them; moderately

limited in his ability to make simple work-related decisions; and markedly limited in his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 833-34.) He opined further that Mr. Martinez was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions. (Tr. 833.)

In the area of social interaction, Dr. Weisz opined that Mr. Martinez is moderately limited in the ability to interact appropriately with the general public; and moderately limited in the ability to set realistic goals or make plans independently of others. (Tr. 834-35) Dr. Weisz found "no evidence of limitation" as to Mr. Martinez's ability to ask simple questions or request assistance or to travel in unfamiliar places or use public transportation. (Tr. 834-35.)

Dr. Weisz also noted, among other things, that Mr. Martinez's opiate addiction causes instability and that he has a "high level of dysfunction/instability" and is a "very complex and severe case." (Tr. 830-31.)

### C.     Relevant Psychological History in May 2015

On May 15, 2015, Mr. Martinez was treated at the ER for seizures. (Tr. 946.) He was diagnosed with a "nonepileptic episode." (Tr. 955.) The ER documentation explains that "nonepileptic seizures" look like true epileptic seizures, but are caused by stress and emotional trauma instead of a brain abnormality. (Tr. 957-58.) It was recommended that Mr. Martinez seek counseling to resolve stress and to treat depression and anxiety "if present." (Tr. 958.) In the approximate two-week period preceding this ER treatment, Mr. Martinez was treated multiple times for similar issues. On April 29, 2015, Mr. Martinez was admitted to inpatient psychiatry through the ER after presenting with suicidal and homicidal ideations. (Tr. 1019.) He was depressed and anxious, and he reported that he was experiencing flashbacks of sexual abuse

that he endured in elementary school. (Tr. 1021.) Mr. Martinez was placed on suicide precautions, diagnosed with PTSD and benzodiazepine dependence with rule out bipolar affective disorder, type 2, and given a fair prognosis. (Tr. 1021-1022.) Mr. Martinez was discharged two days later on May 1, 2015 with follow up care coordinated with Dr. Weisz. (Tr. 1019, 1022.) On May 8, 2015, Mr. Martinez was treated at the ER after reportedly suffering a seizure following four days without sleep. (Tr. 993-998.) On May 11, 2015, Mr. Martinez presented to the ER complaining of nausea, right sided neck pain, and anxiety and fearing he was going to have a seizure. (Tr. 966-92.) He was noted to have a depressed mood. (Tr. 970.) Upon discharge, Mr. Martinez was instructed to avoid benzodiazepines and provided instructional materials on anxiety and panic attacks. (Tr. 982-985.)

### D. The ALJ's Analysis of Dr. Weisz's Opinion

The ALJ evaluated Dr. Weisz's opinion together with that of Dr. Granados. (Tr. 16.) In regard to these opinions, the ALJ reasoned as follows:

> As for the psychological opinions, no confident weight is given to the opinion of Dr. Weisz, Ph.D., that [Mr. Martinez] has marked restrictions in ability to work in proximity of others or work without interruptions from psychiatric based symptoms. Similarly, little weight is given to the opinion of [Dr. Granados] the consultative examiner, who found [Mr. Martinez] to be within reasonable norms of psychological testing and the finding that it is uncertain if the [Mr. Martinez's] recent symptoms stem from actual psychological episodes, medication side effects, a recent medication self-overdosing, or some combination thereof.

(Tr. 16.)[4] Further referring generally to Exhibit 22F, which comprises Dr. Weisz's treatment notes from March 27, 2014, through September 4, 2014 (representing approximately six months of a thirteen month treating period), the ALJ found "that [Mr. Martinez's] newer or exacerbated psychological symptoms are largely situational in nature and therefore should not preclude him from working once he seeks appropriate treatment on a consistent basis." (Tr. 16.)

---

[4] Notably, Dr. Granados's findings do not include the term "uncertain" nor do they include reference to "a recent medication self-overdosing."

Mr. Martinez argues that the ALJ failed to analyze Dr. Weisz's opinion pursuant to the treating physician rule. (Doc. 21 at 15.) Which error, he claims, was not harmless because it contributed to the ALJ's erroneous assessment of his mental RFC. (Doc. 21 at 13-15.) The Commissioner argues that the ALJ's mental RFC finding properly accounted for Dr. Weisz's opinions as reflected by the fact that the ALJ limited Mr. Martinez to "understanding, carrying out, and remembering simple instructions, and to work primarily with things rather than people." (Doc. 23 at 10.)

### 1.    The "Treating Physician" Rule

"According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources." *Langley*, 373 F.3d at 1119; *see* 20 C.F.R. § 404.1527(c)(2)[5] ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). Indeed, where the opinions of treating physicians are medically well-supported and not inconsistent with substantial evidence in the record, they must be accorded "controlling weight." 20 C.F.R. § 416.1527(c)(2).

If, on the other hand, the treating physician's opinion is *inconsistent* with the record or is not supported by medical evidence, it is not given controlling weight. *See Watkins v. Barnhart*,

---

[5] For all claims filed on or *after* March 27, 2017, 20 C.F.R. § 404.1527 was rescinded and replaced with 20 C.F.R. § 404.1520c. 82 Fed. Reg. 5844, 5869. Further, the Social Security Administration rescinded SSR 96-2p effective March 27, 2017, to the extent it is inconsistent with or duplicative of final rules promulgated related to Giving Controlling Weight to Treating Source Medical Opinions found in 20 C.F.R. § 404.1527. 82 Fed. Reg. 5844, 5845.

350 F.3d 1297, 1301 (10th Cir. 2003) ("[I]t is . . . error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." (alteration omitted)). Instead, the opinion, which is "still entitled to deference[,]" *Langley*, 373 F.3d at 1119, is weighed by means of the following six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

C.F.R. § 416.1527(c).

Finally, an ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence[.]" *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004). And he is "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Robinson*, 366 F.3d at 1083.

## 2. The ALJ Failed to Apply the Treating Physician Rule to His Analysis of Dr. Weisz's Opinion

The ALJ's analysis of Dr. Weisz's opinion is deficient in several respects. First, while it is obvious that the ALJ declined to give controlling weight to Dr. Weisz's opinion, his weight assignment pertains only to certain aspects of Dr. Weisz's opinion of Mr. Martinez's limitations in area of functioning—those related to Mr. Martinez's ability to work in proximity of others or work without interruptions from psychiatric based symptoms, both of which fall within the "adaptation" category. (Tr. 16, 833-34.) Because the ALJ did not address Dr. Weisz's opinion

that Mr. Martinez has marked limitations in area of sustained concentration and persistence,[6] it is not clear whether he considered this aspect of Dr. Weisz's opinion and, if so, what weight it was given. *See Robinson*, 366 F.3d at 1082-83 (requiring the ALJ to clearly state specific, legitimate reasons for rejecting or assigning less than controlling weight to a treating physician's opinion; and prohibiting an ALJ from picking and choosing portions of a medical opinion that are favorable to his finding). This is significant because had Dr. Weisz's opinions regarding Mr. Martinez's functioning in the area of sustained concentration and persistence been accorded "controlling weight," this would have altered the RFC at step four, causing more restrictions than the ALJ assessed. *See* SSR 96-8P, 1996 WL 374184, at *7 (S.S.A. July 2, 1996)[7] (stating that in evaluating the claimant's RFC, "medical opinions from treating sources about the nature and severity of an individual's impairments are entitled to special significance and may be entitled to controlling weight"; and if the RFC conflicts with such an opinion, the adjudicator must explain why the opinion was not adopted).

Secondly, in according "no confident weight" to Dr. Weisz's opinion of Mr. Martinez's adaptation impairments, the ALJ did not follow the procedure prescribed in 20 C.F.R. § 416.1527(c) for evaluating the opinion of a treating physician. While an ALJ is not required to mechanically apply, or expressly discuss, each factor enumerated in 20 C.F.R. § 416.1527(c) before rejecting a treating physician's opinion, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009)(citation omitted)). As noted above,

---

[6] Of particular concern in the context of this case is the ALJ's failure to address Dr. Weisz's opinion that Mr. Martinez is markedly impaired in his abilities to complete a normal workday or workweek without interruption from his psychological symptoms or to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 832, 834.)

[7] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (stating that SSR's are entitled to deference).

Dr. Weisz, a specialist in the field of psychology, treated Mr. Martinez twenty-two times over the course of approximately thirteen months, yet there is no indication that the ALJ considered Dr. Weisz's specialization, the length of the treatment relationship, and the frequency of examinations before reducing the weight of some, and altogether ignoring other, aspects of Dr. Weisz's opinion. *See* 20 C.F.R. § 416.1527(c) (stating that the physicians' specialty in the area upon which an opinion is rendered and the length of the treatment relationship are relevant to the weight accorded to a physician's opinion).

Third, other factors that should have been, but were not, made part of the ALJ's analysis are the degree to which Dr. Weisz's opinions were supported by relevant evidence and the consistency between his opinions and the record as a whole. (Id.) For example, the ALJ's opinion reflects that he gave "no confident weight" to Dr. Weisz's opinion that Mr. Martinez had marked limitations in the area of adaptation based, in part, on his observation that Mr. Martinez had "a lengthy work record of working with and around others and sustaining concentration and . . . he stopped working due to his back problems." (Tr. 16.)[8] As to Mr. Martinez's "work record," the Court infers that the ALJ relied on the fact of Mr. Martinez's long-term employment with UPS (which job he left due to his back problems). (Tr. 35-39.) Mr. Martinez last worked for UPS in 2009—approximately six years before he began treatment with Dr. Weisz in 2014. There is no indication that the ALJ considered the extent to which Dr. Weisz's opinions of Mr. Martinez's adaptation-related impairments accorded with significant portions of the record pertaining to Mr. Martinez's more recent history, including: documentation of mental health

---

[8] The ALJ's opinion notes that he relied on Ex. 3E which reflects that after 2009, Mr. Martinez was employed by a hospital in 2010; he was employed by a plumbing company for 9 months between 2011 and 2012; he worked for six months in 2012 as a driver for the post office; and he worked for three months at a lumber company. (Tr. 172.) Thus, after leaving UPS in 2009, Mr. Martinez had intermittent, short term employment, and he lost his most recent job (after having a seizure at work) approximately fifteen months prior to the date upon which he began treatment with Dr. Weisz. (Tr. 172.)

issues beginning in June 2012 (Tr. 281-82, 290, 320); the treatment notes of Dr. Lakind reflecting Mr. Martinez's psychological difficulties in 2012, and the treatment notes of Dr. Amer and Dr. Baten reflecting Mr. Martinez's severe depression, anxiety, and psychological distress in 2014 (Tr. 504, 509, 545-47, 755); the substance of Dr. Weisz's treatment notes that the ALJ cited in his opinion—representing treatment from March 27, 2014, through September 4, 2014, which indicate, among other things, that Mr. Martinez has frequent panic and anxiety attacks (sometimes 7-8 per day), a worsening memory, and severe depression (Tr. 16, 757-73); Mr. Martinez's testimony that he has frequent anxiety attacks (he testified that he had one the night before his testimony), which sometimes cause him to lose consciousness, and that often cause him to go to the hospital (Tr. 46); the portions of Dr. Weisz's treatment notes that the ALJ did not cite—representing treatment from December 22, 2014, through February 26, 2015, which indicate, among other things, that Mr. Martinez was "very irritable, easily provoked, becomes angry and is unable to control" himself; had severe depression, anxiety and addictive behaviors; experienced suicidal ideation; was frantic and desperate on January 30, 2015, leading to 4-5 "crisis calls"; was experiencing 10-30 flashbacks of childhood sexual abuse each day; and that he felt "very unstable" (Tr. 813-17); or the multiple emergency room treatments that Mr. Martinez underwent in 2015 related to his psychological issues. (Tr. 946-1021.) Whether the ALJ considered these aspects of the record in rejecting Dr. Weisz's opinion, and if so, why he concluded that they did not significantly support, or were inconsistent with, Dr. Weisz's opinions is not clear from the ALJ's decision. *See* 20 C.F.R. § 416.1527(c)(3)-(4) (requiring the ALJ to consider the degree to which the physician's opinion is supported by relevant evidence and is consistent with the record); *Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence

supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.").

Finally, Mr. Martinez argues, and the Court agrees, that the ALJ's conclusion that Mr. Martinez's "psychological symptoms are largely situational in nature and therefore should not preclude him from working once he seeks appropriate treatment on a consistent basis" (Tr. 16) exemplifies the prohibited practice of an ALJ substituting his own lay opinion for that of a treating physician.  (Doc. 21 at 15.)  *See Langley*, 373 F.3d at 1121 ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports"; nor may he reject a treating physician's opinion based on his own speculation or lay opinion.").   Exhibit 22F, which the ALJ cited in support of this conclusion, comprises Dr. Weisz's treatment notes from March 27, 2014, through September 4, 2014.  As discussed earlier in this opinion, these treatment notes reflect that Mr. Martinez consistently had severe depression and severe anxiety which, at times, led to seizures.  (Tr. 756-73.)  The notes do not reflect that with "appropriate treatment on a consistent basis," Mr. Martinez's symptoms would not preclude him from working.   Further, insofar as Mr. Martinez reported frequent anxiety attacks (including a report in May 2015 that he was having 7-8 anxiety attacks each day), which, as reflected in other portions of the record, did not subside despite consistent treatment, it is difficult to discern the factual basis underlying the ALJ's conclusion that, contrary to Dr. Weisz's opinion, Mr. Martinez's abilities to complete a normal workday or workweek without interruption from his psychological symptoms or to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were not markedly impaired. (Tr. 832, 834.)

While the Court "cannot insist on technical perfection" and will affirm the ALJ's opinion notwithstanding technical omissions in his reasoning provided that the Court, employing its "common sense," can follow that reasoning and determine that the ALJ applied correct legal standards, the circumstances here do not permit the Court to overlook the ALJ's flawed analysis of Dr. Weisz's opinion. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) (stating the principle that the court should exercise common sense rather than insist upon technical perfection in reviewing an ALJ's determination). Further, aspects of the ALJ's analysis of Mr. Martinez's mental RFC beyond that pertaining directly to Dr. Weisz's opinion, do not persuasively demonstrate that the ALJ's conclusions to the contrary were adequately supported.

For example, citing Dr. Baten's treatment notes from January and February of 2014, Dr. Weisz's treatment notes from March 27, 2014, through September 4, 2014, and Dr. Weisz's treatment notes from December 22, 2014, through February 26, 2015, the ALJ reasoned that

> there is an overall lack of treatment and or counseling[] as it relates to the depression, anxiety, and recently reported PTSD. [Mr. Martinez] alleges disabling limitations; nonetheless, he has only recently availed himself to or sought respective psychological treatment . . . . Therefore, the mental and psychological limitations he professes are not adequately represented or verifiable in the treatment record. . . . Further, the lack of treatment and delayed nature of his mental health treatment does not reflect well or demonstrate the persistence or pervasiveness of the symptoms or limitations [Mr. Martinez] alleges.

(Tr. 15, 503-14, 756-73, 811-17.) This finding does not reflect whether, and if so to what end, the ALJ considered Mr. Martinez's 2012 treatment in the emergency room for psychological symptoms (including the fact that those treatment notes reflected additional treatment dating back to 2011); his admittance in March 2014 to UNM hospital related to seizures; his treatment in 2014 with Drs. Greer, Amer, and Baten; or his series of emergency room and one inpatient treatment in 2015 for psychological symptoms which ultimately led to a diagnosis that his

seizures were caused by anxiety and depression instead of epilepsy. *See Clifton*, 79 F.3d at 1010 (requiring the ALJ to discuss both the evidence supporting his decision *and* the probative evidence that he rejects); 20 C.F.R. § 416.1527(c)(2)(stating that the opinions of treating physicians that are medically well-supported and not inconsistent with substantial evidence in the record must be accorded "controlling weight"). Further, this analysis does not demonstrate the ALJ's reasons for discounting Dr. Weisz's opinions, which derived from regular visits over a sustained period of time (twenty-two visits over the course of thirteen months).

As another example, the ALJ reasoned that:

the available and reported mental status examinations demonstrate [that Mr. Martinez] is cognizant, functional, and generally of a capacity and state of mind wherein he can reasonably be expected to perform simple and learned tasks in appropriate vocational settings. For example, in spite of his anxiety, depression, [and] recently established PTSD, he is found to be alert and cooperative with clear, logical thoughts and goal-directed thoughts, intact comprehension and fluent speech. . . . Additionally, on a mini-mental status examination, [Mr. Martinez] scored 28 out of a possible 30 points, which demonstrated to be within the normal range of functioning[.]

(Tr. 15.) In support of this finding, the ALJ relied on: a "neurologic" note from Mr. Martinez's March 10, 2014, admittance to UNM Hospital which read: "[t]he patient is alert and oriented x3. Speech is fluent and comprehension is intact" (Tr. 15, 514); "behavioral observations" made by Dr. Granados as a result of his April and June 2014 neuropsychological evaluation stating, in part, that Mr. Martinez "was pleasant and cooperative" and his "[t]hought process was clear, logical and goal directed"; and Dr. Granados's note that Mr. Martinez's "raw score of 28/30 on the Mini-Mental status Examination is *mostly* within normal limits" (Tr. 778-79 (emphasis added.) While these aspects of the record support the ALJ's findings, it is notable that the ALJ ignored other aspects of Dr. Granados's evaluation that were not favorable to his conclusion that Mr. Martinez is "cognizant" and "functional." For example, Dr. Granados noted that

Mr. Martinez was able to "accurately name the correct month, season, and year but not the date or day of the week." (Tr. 779.) He also noted that Mr. Martinez had a "markedly slowed" processing speed" and "a marked level of generalized psychological distress" which were the likely cause of Mr. Martinez's "cognitive inefficiencies." (Tr. 779-81.) Because the ALJ did not address Dr. Granados's evaluation as a whole, it is unclear why he found certain aspects of the evaluation useful and persuasive while otherwise according it, along with Dr. Weisz's opinions, "little weight" and "no confident weight," respectively. *See Robinson*, 366 F.3d at 1083 (stating that an ALJ is "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability"); *see also Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (indicating that to accord "little weight to" a physician's opinion is tantamount to "effectively rejecting" it).

The ALJ also found that "the overall record indicates and suggests that [Mr. Martinez's] symptoms have been reasonably controlled by medication and minimal counseling, such that he has been able to generally function adequately in spite of his underlying impairments." (Tr. 15.) In support of this conclusion, the ALJ cited Dr. Lakind's treatment notes from May of 2013 and Dr. Baten's treatment notes from August 6, 2014. (Tr. 15; see Tr. 454, 755.) This conclusion is not supported by substantial evidence.

The Court notes that neither Dr. Lakind's nor Dr. Baten's treatment notes support the ALJ's conclusion that Mr. Martinez's symptoms were "reasonably controlled by medication and minimal counseling." (Tr. 454, 755.) Dr. Lakind, who last saw Mr. Martinez in May 2013, did not note or otherwise opine that Mr. Martinez's symptoms were "reasonably controlled by medication" or counseling. (See Tr. 15 citing Tr. 454) While Dr. Baten's treatment notes indicate that Mr. Martinez reported that he has been seeing Dr. Weisz "which is helping him a

lot," Mr. Martinez continued to experience and seek treatment for non-epileptic seizures, panic and anxiety attacks, and depression through 2015. In light of the substantial evidence in the record, which was not addressed by the ALJ, and which reflects the persistence of these psychological difficulties despite Mr. Martinez's continuing treatment, the Court cannot conclude that the ALJ's decision in this regard was supported by substantial evidence. *See Hamlin*, 365 F.3d at 1214 (stating that an ALJ's "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.").

In summary, the Court concludes that the ALJ's opinion does not demonstrate that he applied the correct legal standards to his evaluation of Dr. Weisz's opinions. Nor does the ALJ's decision reflect that his conclusions contradicting Dr. Weisz's opinions were supported by substantial evidence. Furthermore, for the reasons that follow, the Court concludes that these errors were not harmless.

### 3. The ALJ's Rejection of Dr. Weisz's Opinions Was Not Harmless Error

In the context of Social Security law, an error is "harmless" if the court may "confidently say that no reasonable administrative factfinder, following the correct legal analysis, could have resolved the factual matter in any other way." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). Here, the Commissioner argues that the ALJ's mental RFC appropriately accounted for Dr. Weisz's opinions (and those of Dr. Granados) because the ALJ limited Mr. Martinez to understanding, carrying out, and remembering simple instructions, and to work primarily with things rather than people. (Doc. 23 at 10.) Even assuming that these limitations derived from the ALJ's application of the appropriate legal standards and are supported by substantial evidence, they do not account for Dr. Weisz's opinions regarding Mr. Martinez's marked

limitations in at least two significant areas of functioning—namely, "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance"; and "the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 832, 834.)

As discussed earlier in this Opinion, the record includes substantial evidence of Mr. Martinez's severe depression and his frequent severe anxiety and panic attacks which, at times lead to seizures. These psychological issues have frequently led to Mr. Martinez's emergency room treatment. Although this evidence could reasonably support Dr. Weisz's opinions regarding Mr. Martinez's ability to maintain a regular schedule or complete a regular work day and work week, in evaluating Mr. Martinez's mental RFC, the ALJ wholly ignored this aspect of Dr. Weisz's opinion, and largely ignored the evidence that supports it. Under these circumstances, the Court cannot "confidently say that no reasonable administrative factfinder, following the correct legal analysis, could have resolved" the matter of whether, despite these psychological issues, Mr. Martinez is able to maintain regular attendance and perform at a consistent pace. *Allen*, 357 F.3d at 1145. Accordingly, the ALJ's erroneous failure to appropriately analyze Dr. Weisz's opinions in this regard is not harmless. This matter shall be remanded for a decision that provides the Court "with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen*, 436 F.3d at 1165.

## IV. Conclusion

For the reasons stated herein, Mr. Martinez's *Motion to Reverse and Remand for Payment of Benefits or in the Alternative, for Rehearing, With Supporting Memorandum* filed June 15, 2017. (Doc. 21.) is **GRANTED** insofar as it seeks remand for rehearing.

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**